## BRIAN GAUDIO v. GRIFFIN HEALTH SERVICES CORPORATION
## (SC 15756)

Callahan, C. J., and Berdon, Katz, McDonald and Peters, Js.

---

524

Argued November 4, 1998—officially released July 20, 1999

*Emanuel N. Psarakis*, with whom, on the brief, were *Lisa Gizzi* and *Andrew S. Golden*, for the appellant (defendant).

*Lawrence C. Sgrignari*, for the appellee (plaintiff).

*Robert B. Mitchell*, *Margaret M. Sheahan* and *Loraine M. Cortese-Costa*, filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Opinion*

BERDON, J. This appeal calls upon us to resolve a number of issues arising out of a jury trial for wrongful discharge. In broad strokes, the jury awarded damages on two grounds: (1) the defendant employer breached an implied contract not to terminate the plaintiff employee except for just cause; and (2) the former defamed the latter. We decline to set aside either aspect of this verdict, but nevertheless conclude that a remittitur is required.

The jury reasonably could have found the following facts. The plaintiff, Brian Gaudio, had worked in various capacities for the defendant, Griffin Health Services Corporation (hereinafter defendant or hospital), since 1985. After two years of part-time work in the laundry department and one year of part-time work in the patient transport division, the plaintiff was employed as a full-time weekend security officer in 1988. There was a significant amount of evidence concerning the nature of the promises extended to the plaintiff by the defendant, which we discuss at length below. For present purposes, it suffices to note that, at trial, the plaintiff relied heavily upon the content of the defendant's Personnel Policies and Procedures Manual (manual),

which was given to him when he commenced his employment.

On May 8, 1990, the plaintiff and his partner Brian Healey were called to the emergency room to guard a patient in the psychiatric holding area; the patient had psychological problems and was in an alcohol-induced stupor. Several hours later, the patient woke up; he was still extremely intoxicated. In the plaintiff's words: "The patient became very verbally abusive, hostile, aggressive, started [destroying] hospital property, [made] hand gestures, us[ed] profanity, [and became] like a firecracker that was being lit off. He exploded." Upon learning that he was being admitted to the hospital, the patient said, "No fucking way am I staying here tonight," and told the plaintiff that, "[i]f it comes down to me or you, it's going to be you." Moreover, the patient struck his fist into his palm, paced back and forth, punched the door and the walls, and ripped the telephone off the wall. In order to subdue the patient, the physician in charge, Joseph Dell'Aria, ordered a "Code 7"—a request for all male personnel to assist in restraining the patient. A number of male staff members responded.

Although there was conflicting testimony concerning what happened next, the jury reasonably could have found the following facts. The patient charged the plaintiff and Healey in an effort to escape from the room. The plaintiff and Healey prevented the escape by wrestling the patient to the ground. The plaintiff and two others then lifted the patient onto a stretcher. During this time, the patient kicked, punched, bit, and spat at the plaintiff and his coworkers. Once he had been placed on a stretcher, the patient "bang[ed] his head against the guard rails . . . [and] whack[ed] his head from side to side . . . attempting to rock the stretcher and flip [it over]." The plaintiff climbed onto the stretcher in order to stabilize it. The patient continued

to punch, bite and spit at the plaintiff, saying, "Fuck you, you big motherfucker. I got AIDS and you're going to die with AIDS." The plaintiff testified that he employed a proper restraint technique that comported with hospital policy. The plaintiff explained that he did this in order "to prevent [the patient] from further biting and spitting at [him] and [causing] further injury to himself from banging [his head against] the guard rails of the stretcher . . . ." The patient was successfully restrained in short order. While restrained, the patient threatened to sue the hospital. The plaintiff required medical attention on two separate occasions for the injuries that he suffered as a result of his participation in the restraint of the patient.

At a meeting convened at 9 o'clock the following morning—less than twelve hours after the incident—the hospital management decided to terminate the plaintiff, even though he had never before been subject to discipline for any misconduct (meeting). This decision was based upon a report presented by William Powanda, the vice president of the hospital. Powanda admitted that he did not speak with any of the witnesses. Instead, his presentation was based almost entirely upon a memo prepared by Raymond Gurdak, the hospital's security supervisor (Gurdak memo). Gurdak, in turn, merely summarized the statements of several purported witnesses, some of whom had allegedly accused the plaintiff of striking the patient.[1] The plaintiff questions the adequacy of the Gurdak memo, a concern that we address more fully in part I D of this opinion. Powanda also had access to a form that Gurdak had asked the plaintiff to complete on the evening of the incident (incident report). In this incident report, the plaintiff stated that the patient was "very violent and combative," that the patient was "totally out of control," and that, "to protect [himself] and the people around

---

[1] The plaintiff expressly denied this accusation.

[him, the plaintiff] had to use reasonable force by knocking the patient down." The plaintiff further explained in the incident report that, in order to prevent the patient from biting, scratching and spitting at staff members, he "had to use reasonable force by holding his face down." The plaintiff neither stated nor implied that he struck the patient.

The following people did *not* attend the meeting, because they were not invited to do so: the plaintiff; Dell'Aria, the physician in charge on the night of the incident (listed as a witness on the incident report); Healey, the plaintiff's partner (also listed as a witness on the incident report); and Janice Yankowski, the hospital's director of human resources. The patient was never contacted for his version of the incident.

According to Powanda, the defendant "didn't want to make the patient issue bigger than it was with the patient . . . ." At the meeting held the morning after the incident, the hospital's management addressed the fear that the patient would assert a lawsuit against the defendant. For this reason, the defendant's risk manager was present, even though she ordinarily did not attend such meetings.

The day after the meeting, Gurdak delivered a letter of termination to the plaintiff, which included the following sentence: "[You] displayed bad judgment and did not follow established procedures regarding restraint of a patient." At least three of the plaintiff's supervisors read the letter: Powanda (the vice president) drafted it; Yankowski (the director of human resources) signed it; and Gurdak delivered it.[2] When he delivered the letter, Gurdak told the plaintiff that he was being termi-

---

[2] The dissent asserts that Yankowski "wrote the letter informing the plaintiff that his employment had been terminated." This is incorrect. Powanda admitted upon cross-examination that he drafted the letter, testimony that the jury reasonably could have credited.

nated "due to the fact that the hospital is in fear of a lawsuit from the patient." A copy of the letter was placed in the plaintiff's personnel file.

The plaintiff testified that he was emotionally devastated in the wake of his discharge, and that he had a difficult time making financial ends meet. As a result of his depression, a romantic relationship terminated and the plaintiff lost a substantial amount of weight. Although he eventually secured a job as a university security officer, the plaintiff testified that he felt "like a person with bad credit . . . [and] that [he] would never have an opportunity to seek a decent job . . . ."

In response to written interrogatories, the jury made the following findings: (1) the defendant was bound by an implied contract; (2) the terms of this contract prohibited termination without just cause; and (3) the defendant did not possess just cause to terminate the plaintiff.[3]

---

[3] "SPECIAL INTERROGATORIES

"Breach of Contract

"1. Did the plaintiff prove, by a fair preponderance of the evidence, that a binding contract of employment existed between the plaintiff and the defendant?

"ANSWER:     YES _X_  NO ____

"If your answer is yes, go on to Question 2.

"If your answer is no, you must find for the defendant on the plaintiff's breach of contract claim as well as the plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Then proceed to the defamation claim.

"2. If your answer to the preceding interrogatory is yes, did the defendant terminate the plaintiff's employment without just cause and outside the area of legitimate managerial discretion?

"ANSWER:     YES _X_  NO ____

"3. If your answer to interrogatory number 1 was yes and you further find the contract entitled the plaintiff to progressive discipline, did the defendant terminate the plaintiff's employment without providing him with the progressive discipline provided for in the contract under the circumstances?

"ANSWER:     YES _X_  NO ____

"4. If your answer to either interrogatory 2 or 3 is yes, your verdict on the breach of contract claim should be for the plaintiff and you should consider the issue of damages.

The jury also found that the defendant (1) breached the implied covenant of good faith and fair dealing[4] and (2) defamed the plaintiff.[5] Accordingly, the jury rendered

"If you do not answer either interrogatory 2 or 3 yes, your verdict on the breach of contract claim should be in favor of the defendant."

[4] "SPECIAL INTERROGATORIES

"Breach of Implied Covenant of Good Faith and Fair Dealing

"1. Did the plaintiff prove by a preponderance of the evidence, that [the hospital] acted in bad faith?

"ANSWER:    YES _X_    NO ____

"If your answer is yes, you must find for the plaintiff on the claim for breach of the implied covenant of good faith and fair dealing and determine what damages, if any, he has sustained.

"If your answer is no, you must find for the defendant on this claim and proceed now to the interrogatories regarding the defamation claim."

[5] "SPECIAL INTERROGATORIES

"Defamation

"1. Were the statements made by the defendant in the letter terminating the plaintiff's employment substantially true?

"ANSWER:    YES ____    NO _X_

"If your answer is yes, your verdict on the defamation count would be for the defendant and you would proceed no further.

"2. I have instructed you that there is a publication requirement in a defamation action and that requirement is met where a defamatory statement is communicated among the plaintiff's supervisors and is included in his personnel file. Here the evidence showed that there was such communication and the defamatory letter was put in the plaintiff's personnel file.

"There is another claim of publication to which this second interrogatory is directed: Did the plaintiff prove by a preponderance of the evidence that he was strongly compelled to publish the defamatory words concerning himself and that it was reasonably foreseeable to [the hospital] that the plaintiff would be so compelled?

"ANSWER:    YES _X_    NO ____

"3. Were the statements made by the defendant in the letter terminating the plaintiff's employment privileged?

"ANSWER:    YES ____    NO _X_

"If your answer is yes, go to question 4. If your answer is no, your verdict on the defamation claim should be for the plaintiff if you have also concluded the statements were false and if there is publication.

"4. If privileged, were the statements made by the defendant in the letter terminating the plaintiff's employment made maliciously or for an improper or unjustifiable motive?

"ANSWER:    YES _X_    NO ____

"If your answer is yes, your verdict on the defamation claim should be for the plaintiff. If your answer is no, your verdict on the defamation count should be for the defendant."

verdicts in favor of the plaintiff,[6] awarding him $100,000 in economic damages and $100,000 in noneconomic damages.[7] The trial court thereafter denied the defendant's motions to set aside the verdict, for judgment notwithstanding the verdict, and for remittitur. The court thereupon rendered judgment for the plaintiff in accordance with the jury's verdict. We affirm the judgment except as to the award of economic damages, with respect to which we order a remittitur in the amount of $39,089.

[6] "PLAINTIFF'S VERDICT FORM
BREACH OF CONTRACT
On the Breach of Contract claim, our verdict is for the plaintiff and we find damages as follows:

| | |
|---|---|
| Economic Damages | $100,000.00 |

DATE October 22, 1996     FOREPERSON /s/ Perry A. Cacchillo"
"PLAINTIFF'S VERDICT FORM
BREACH OF IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING
On the claim of Breach of the Implied Covenant of Good Faith and Fair Dealing, we find for the plaintiff and award damages as follows:

| | |
|---|---|
| Economic Damages | $100,000.00 |

DATE October 22, 1996     FOREPERSON /s/ Perry A. Cacchillo"
"PLAINTIFF'S VERDICT FORM
DEFAMATION
On the defamation claim, we find for the plaintiff and award damages as follows:

| | |
|---|---|
| Economic Damages | $100,000.00 |
| Non Economic Damages | $100,000.00 |
| TOTAL | $200,000.00 |

DATE October 22, 1996     FOREPERSON /s/ Perry A. Cacchillo"

[7] The jury concluded that the plaintiff suffered $100,000 in economic damages, an amount that it listed on three separate verdict forms (each one of which corresponded with a different cause of action). The court instructed the jury that, "as to economic damages, the plaintiff is not entitled to multiple recovery—if the plaintiff proves any one, more than one, or all of his claims as a basis for economic damages, he is still entitled to one recovery for economic damages." Accordingly, no one questions that it was the intention of the jury to award economic damages in the total amount of $100,000, notwithstanding the fact that this amount was listed on three separate verdict forms. See footnote 33 of this opinion for the court's instruction to the jury defining economic damages.

The jury awarded an additional $100,000 in noneconomic damages for defamation. See footnote 30 of this opinion for the trial court's instruction to the jury defining noneconomic damages.

## I

The defendant claims that the trial court incorrectly submitted the following issues to the jury: (1) whether an implied contract bound the defendant to continue to employ the plaintiff unless there were just cause for his termination; and (2) if so, whether the defendant breached that contract. The defendant further claims that there was insufficient evidence to support the jury's affirmative answers to these two questions. We disagree.

## A

As a threshold matter, the defendant argues that—as a matter of law—it was not bound by an implied contract. Accordingly, the defendant claims that the court improperly submitted this issue to the jury. We are not persuaded.

"[A]ll employer-employee relationships not governed by express contracts involve some type of implied 'contract' of employment. 'There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working.' 1 H. Perritt, Employee Dismissal Law and Practice (3d Ed. 1992) § 4.32, p. 326." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 13, 662 A.2d 89 (1995). It is firmly established that "statements in an employer's personnel manual may . . . under appropriate circumstances . . . give rise to an express or implied contract between employer and employee. *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 564, 479 A.2d 781 (1984); see generally *Dolak* v. *Sullivan*, 145 Conn. 497, 503, 144 A.2d 312 (1958) (statements in written retirement plan gave rise to employer-employee contract); *Tilbert* v. *Eagle Lock Co.*, 116 Conn. 357, 361–63, 165 A. 205 (1933) (assurances in employee benefit plan constituted enforceable promise to pay benefits in accordance with plan)." *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn.

190, 198–99, 520 A.2d 208 (1987), overruled in part on other grounds, *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 (1993); see note, "Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 Harv. L. Rev. 1816, 1820–21 (1980).

In this case, the manual does not contain express contract language that definitively states either that employees are at-will or that they may be terminated only for just cause. "In the absence of [such] language . . . the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact. *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981)." (Internal quotation marks omitted.) *Finley* v. *Aetna Life & Casualty Co.*, supra, 202 Conn. 199. Because it is an inference of fact, determining the intent of the parties is within the province of the jury: it is " 'the raison d'etre of the jury system.' " *Coelho* v. *Posi-Seal International, Inc.*, 208 Conn. 106, 113, 544 A.2d 170 (1988); accord *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 15; *Finley* v. *Aetna Life & Casualty Co.*, supra, 199; *Toussaint* v. *Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 613, 292 N.W.2d 880 (1980); *Pine River State Bank* v. *Mettille*, 333 N.W.2d 622, 628 (Minn. 1983); *Weiner* v. *McGraw-Hill, Inc.*, 57 N.Y.2d 458, 465–66, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982). Accordingly, the trial court correctly submitted to the jury the task of determining the contours of the parties' intentions.

## B

The defendant further maintains that there was insufficient evidence to support various aspects of the verdict that the jury rendered and, accordingly, challenges the trial court's decision not to set aside these aspects

of the verdict. The standard of review that governs such claims is well settled, and extremely rigorous. We shall delineate it here, and invoke it as necessary throughout our opinion.

We are disinclined to disturb jury verdicts, and we accord great deference to the vantage of the trial judge, who possesses a unique opportunity to evaluate the credibility of witnesses. *Lopez* v. *Price*, 145 Conn. 560, 564, 145 A.2d 127 (1958). "The concurrence of the judgments of the [trial] judge and the jury . . . is a powerful argument" for upholding the verdict. Id.; accord *Fink* v. *Golenbock*, 238 Conn. 183, 207–208, 680 A.2d 1243 (1996); *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 610, 662 A.2d 753 (1995); *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988). Furthermore, it is not the function of this court to "sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, *in the light most favorable to sustaining the verdict*, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Purzycki* v. *Fairfield*, 244 Conn. 101, 112–13, 708 A.2d 937 (1998). In making this determination, "[t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, supra, 208. In other words, "[i]f the jury *could* reasonably have reached its conclusion, the verdict must stand," even if this court disagrees with it. (Emphasis added.) *Donner* v. *Kearse*, 234 Conn. 660, 681–82, 662 A.2d 1269 (1995); see *Trzcinski* v. *Richey*, 190 Conn. 285, 298, 460 A.2d 1269 (1983).

Two further fundamental points bear emphasis. First, the plaintiff in a civil matter is not required to prove

his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient.[8] Second, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury. *Purzycki* v. *Fairfield,* supra, 244 Conn. 112–13.

## C

The defendant's argument that the jury reasonably could not have found an implied contract cannot withstand scrutiny through the lens of this standard of review. We have stated with unambiguous clarity that "employers can protect themselves against employee contract claims based on statements made in personnel manuals" by following either (or both) of two simple procedures: (1) "eschewing language that could reasonably be construed as a basis for a contractual promise"; and/or (2) "including appropriate disclaimers of the intention to contract . . . ." *Finley* v. *Aetna Life & Casualty Co.,* supra, 202 Conn. 199 n.5.[9] The defendant concedes that the manual given to the plaintiff when he began working for the defendant contains no disclaimers. The question, then, is whether the jury reasonably could have concluded that the manual eschews

[8] The plaintiff in a civil case "sustain[s] his burden of proof as to any essential element in his cause of action if the evidence, considered fairly and impartially, induce[s] in the mind of the trier a reasonable belief that it [is] more probable than otherwise that the facts involved in that element [are] true." *Busker* v. *United Illuminating Co.,* 156 Conn. 456, 458, 242 A.2d 708 (1968).

[9] We described these two procedures in *Finley* in order to address the fear—articulated in the amicus brief submitted by the Connecticut Business and Industry Association—that our decision in that case would make " 'every termination a potential jury trial.' " *Finley* v. *Aetna Life & Casualty Co.,* supra, 202 Conn. 199 n.5. More than ten years later, we now have before us yet another amicus brief, authored by the same organization, expressing the same fear. This time, the amicus characterizes the facts of this case as the incarnation of "hypothetical nightmare scenarios" and asks—in apparent desperation—" 'Who *can* be discharged without employer liability?' " (Emphasis in original.) In answer to this query, we again refer the amicus to our discussion in *Finley.*

language that evinces an intention to contract. We answer this question in the negative.

The manual contains language from which the jury reasonably could have inferred the presence of an implied contract not to terminate the plaintiff except for just cause. The manual provides that the defendant will "protect the privileges, interests, and benefits of its employees" and treat them "reasonably," "equitably," and "uniformly." In four separate statements, the defendant promises that it will be "fair" in its dealings with employees. In three separate statements, the defendant pledges that it will treat all employees "consistently."

The manual gives shape to these promises by stating that a discharge may be justified only by "[r]epeated violations or incidents involving serious misconduct . . . ." In a policy entitled "Grievance Procedure," the defendant requires "documentation to support the management['s] action . . . [including proof] that all the facts related to the event were reviewed." A nonexhaustive list of "factors that should be considered in determining the action to be taken" includes: "seriousness, frequency and nature of the violation; length of service; work history; and customary disciplinary practices." Exceptions to these or any other policies must be obtained pursuant to the following four stage process: (1) a request for an exception must be "submitted to the Administrative Representative and the Personnel Director for review and analysis"; (2) these officials must "present their evaluation and recommendation on the Exception to the Administrative Cabinet"; (3) the cabinet must "review and make a recommendation to the Administrator"; and (4) "[a]ll Exceptions to [the] Policy require the approval and signature of the Administrator." It is undisputed that this procedure was not followed in the present case.

From nothing more than the language of the manual, the jury reasonably could have concluded that the defendant intended to bind itself to a contract, pursuant to which it could not terminate employees absent just cause. In sharp contrast to the premise that lies at the core of at-will employment—that an employer possesses an unfettered right to terminate an employee at any time, for any reason or no reason—the defendant in this case promised to hold itself to more rigorous standards. See *Parsons* v. *United Technologies Corp.,* 243 Conn. 66, 79, 89, 700 A.2d 655 (1997). More specifically, the defendant promised, inter alia, not to terminate employees unless they had either committed "[r]epeated violations" or engaged in "serious misconduct." The jury reasonably could have concluded that this is the very definition of just cause.

Furthermore, the jury reasonably could have concluded that the testimony of other employees of the hospital confirmed this interpretation of the manual. The director of human resources, Yankowski, testified that employees were entitled to rely on the fact that the defendant would comply with the policies contained in the manual, and that—pursuant to the manual—employees could *not* be terminated "for no reason"; instead, the defendant "would endeavor to find a reason [for the termination] and to be fair in that reasoning."[10]

Similar testimony was given by two other agents of the hospital. The hospital's security supervisor testified that employees of the security department could not

---

[10] The defendant claims that, in the following testimony, Yankowski indicated that the defendant is an at-will employer: "[w]e consider that we are an employer at will *[and] that an employee can quit on us at any time.*" (Emphasis added.) As our emphasis makes clear, Yankowski said nothing about the defendant's duty to its employees: she did not testify that the defendant could terminate an employee without cause. To the contrary, her statement that "we are an employer at will" followed immediately upon the heels of her testimony that "[w]e would not let an employee go for no reason."

be terminated absent cause, and that this protection stems from the manual. The vice president of the hospital emphasized that, pursuant to the manual, an employee could not be terminated unless he had repeatedly violated hospital policies or engaged in serious misconduct.

In addition, the jury reasonably could have credited the plaintiff's testimony that "I was promised [that] as long as I was doing my job and . . . continued to do a good job, I would be there for as long as I wished . . . ." The jury further could have credited his testimony that personnel in the human resources department made this promise to the plaintiff in 1985, and that both patient transport and security personnel reiterated this promise when the plaintiff began working for those units of the hospital. It is of no moment that the plaintiff could not recall the names of the individuals who made these promises. As we recently stated in *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 12, "[b]ecause the plaintiff testified as to . . . alleged oral statements concerning his future job security and the [trier] found that testimony credible, there was sufficient evidence for the [trier] to find that the statements were in fact made . . . [even if] the defendant's witnesses [had expressly] denied having made the statements . . . ."

Based upon the text of the manual and the testimony of both the plaintiff and several agents of the hospital, the jury reasonably could have concluded: (1) that an implied contract existed; and (2) that the terms of this contract precluded the defendant from terminating employees absent just cause.

D

The defendant argues in the alternative that, even if an implied contract did exist, the jury could not reasonably have concluded that the defendant committed a

breach. The defendant also argues that the trial court incorrectly instructed the jury with respect to the plaintiff's breach of contract claim. We disagree on both counts.

It is well settled that "courts should not lightly intervene to impair the exercise of managerial discretion . . . ." (Internal quotation marks omitted.) *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 589, 693 A.2d 293 (1997); see *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 216, 520 A.2d 217 (1987). Although " 'just cause' substantially limits [managerial] discretion," this simply means that employers are "forbid[den] . . . to act arbitrarily or capriciously."[11] *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 475, 427 A.2d 385 (1980). In other words, an employer who wishes to terminate an employee for cause must do nothing more rigorous than "proffer a proper reason for dismissal." Id.

In the present appeal, the trial court instructed the jury as follows: "The [defendant] must *provide a reason for the dismissal* of an employee and cannot *arbitrarily or capriciously* terminate an employee. . . . [A]n employer rightfully has managerial discretion in making such decisions and the right to make independent, good faith judgments. In making your decision, *you cannot interfere with the legitimate exercise of managerial discretion*."[12] (Emphasis added.) In response to the

[11] We reiterate that an employer can easily avoid the "substantial limitation" imposed by our jurisprudence of just cause termination by either eschewing or disclaiming such a contractual obligation. See footnote 9 of this opinion and the accompanying text. It is only after an employer has elected to subject itself to liability that it is precluded from terminating an employee for a reason that is either arbitrary or capricious.

[12] The trial court emphasized this concept as follows: "Recognizing the right of management to make good faith determinations about personnel and the need to give management discretion in these areas so that the courts and/or juries don't start micro managing companies, you . . . must decide whether on the facts of this case the manner in which the investigation was conducted and the decision to terminate that was made [were] so arbitrary,

interrogatory based upon this instruction, the jury determined that the defendant "terminate[d] the plaintiff's employment without just cause and *outside the area of legitimate managerial discretion*." (Emphasis added.) As the emphasized language makes clear, both the charge and the interrogatory comport with our well settled law.[13] Accordingly, the trial court correctly instructed the jury on this issue.

In light of the court's instruction, the jury reasonably could have concluded that the defendant did not possess just cause to terminate the plaintiff. In the report that he wrote on the night of the incident, the plaintiff twice characterized the force that he was required to employ in order to restrain the patient as "reasonable." Accordingly, this report could not have supplied the basis of his termination.[14] The only other relevant document that Powanda relied upon in his report to the

capricious or lacking in good faith so as to warrant you in concluding that the termination was not made for just cause."

[13] The dissent argues "that the trial court's instruction allow[ed] a de novo review of the existence of just cause . . . ." Making the same point more specifically, the defendant argues that "the trial judge permitted the jury to interfere with legitimate managerial discretion." These arguments fail to account for the text of both the interrogatory and the jury instruction upon which it was based, each of which expressly instructed the jurors that they did not possess the authority to invade the defendant's "legitimate managerial discretion." Contrary to the suggestion contained in the dissenting opinion, the trial court did not instruct the jurors to determine "whether the [defendant] correctly concluded that the [plaintiff] had engaged in misconduct . . . ." Instead, the court emphasized on three separate occasions that the jury's task was "to determine whether the [hospital] acted in an arbitrary and capricious manner." In short, the concern articulated by both the dissent and the defendant finds no support in the record.

[14] The defendant asserts that the plaintiff "was given the opportunity to respond to the accusation that he hit a patient when Gurdak asked him to write an incident report." This claim misstates the chronology in a misleading manner. In fact, no accusations were registered until *after* the plaintiff had already submitted his incident report. Accordingly, at the time that the plaintiff completed the incident report, there were no accusations to which he could respond.

hospital management was the Gurdak memo, the sufficiency of which the jury had substantial reason to question.[15] In the one and one-half page memo, Gurdak purported to paraphrase brief comments by eight alleged witnesses to the incident. One of these "witnesses," Roy Garogalo, a Derby police officer, testified that he never spoke with Gurdak about the plaintiff's conduct. According to Robert Steffero, the first person to respond to the request for assistance,[16] five of the remaining seven "witnesses" listed in the Gurdak memo had not been present in the room during the incident.[17] Neither of the remaining two witnesses—Chris Edwards or Dell'Aria—asserted that the plaintiff struck the patient.[18] Moreover, these latter two witnesses

---

[15] Powanda also had access to the patient's medical report, which indicated new injuries (including a tiny laceration on his lip and a slightly loose tooth) in the wake of the incident. These injuries are hardly surprising in light of the testimony that the patient thrashed about, punched the walls, and repeatedly slammed his head against the guard rails of the stretcher. The jury reasonably could have declined to attribute the new injuries to the plaintiff's participation in the restraint.

[16] Although Steffero was the first person to respond to the "Code 7," he was not interviewed by Gurdak.

[17] Steffero specifically testified that one of the alleged witnesses, Michael D'Angelo, was not in the room during the incident. Steffero also testified that no women were in the room at that time, either. This comports with the meaning of a "Code 7"—which is an order for all *male* personnel to respond—and contradicts the Gurdak memo, which purports to paraphrase the remarks of four female witnesses.

[18] Gurdak paraphrased Edwards as having said that "*the guard* hit the patient . . . [and] pushed the patient's face to the side to try to control him." (Emphasis added.) Edwards did not identify "the guard" by name, even though several guards responded to the "Code 7" and were involved in the restraint.

Gurdak paraphrased Dell'Aria as stating that "the patient was striking [the plaintiff] . . . . [The plaintiff] then got on top of the patient and tried to restrain him, [and] *the patient got hit* with a blow to the head, during the scuffle." (Emphasis added.) Dell'Aria's use of the passive voice creates substantial ambiguity; the patient may have been hit by the plaintiff, the patient may have been hit by another employee who had responded to the "Code 7," or the patient may have hit his head against the guard rails of the stretcher. Dell'Aria testified that he "did not see [the plaintiff] punch the patient in the face."

described the patient as "extremely violent," "aggressive," "agitated," and "abusive." Edwards blamed Dell'Aria for "let[ting] this get out of hand . . . ." Furthermore, Dell'Aria contradicted Gurdak's testimony that he conducted formal interviews with witnesses in a separate room. Instead, Dell'Aria testified that Gurdak intercepted him in the hallway as he was on his way to take a shower and casually asked him what happened.

In addition, the defendant had a policy in its manual that provides as follows: "discharge actions may be imposed only with the prior discussion and approval of the Personnel Director . . . ." As previously discussed, exceptions to this or any other policy may be obtained only through recourse to an intentionally cumbersome bypass procedure. In the present case, Yankowski did not attend the meeting at which the plaintiff's fate was determined. Accordingly, the defendant neither "discussed" the discharge with her nor sought her "prior . . . approval."[19] Nor did the defendant secure an exception to the policy.[20]

Further, there was ample evidence from which the jury reasonably could have concluded that the defendant (1) did not reasonably believe that the plaintiff had assaulted a patient and (2) was in fact motivated by its desire to avoid legal liability.[21] First, the patient threatened to sue the defendant. Second, during the

Only two of the remaining five "witnesses" allegedly stated that they observed the plaintiff strike the patient. (Again, the jury reasonably could have concluded that neither of these two witnesses was even in the room during the incident.)

[19] Although the dissent is correct to observe that "Yankowski was aware of the plaintiff's discharge," notice is not the same thing as "prior discussion and approval."

[20] While the defendant is quite right to emphasize that an assault upon a patient may merit "the severest discipline," the bare *accusation* of such an assault cannot possibly merit violation of the defendant's grievance policy.

[21] For this reason, the defendant's emphasis on the gravity of assaulting a patient is of no moment.

meeting, the hospital management addressed the fear that the patient would assert a lawsuit against the defendant. Third, the defendant's risk manager was present at the meeting, even though she ordinarily does not attend such meetings. Fourth, Gurdak informed the plaintiff that he was being terminated "due to the fact that the hospital is in fear of a lawsuit from the patient." Fifth, Powanda testified that the procedures followed in this matter were "unusual," and that he could not "recall ever having a meeting based on an incident that soon after the incident." Sixth, a number of witnesses were not interviewed. Seventh, a number of individuals who should have attended the meeting were not invited to do so. Eighth, the plaintiff was not permitted to respond to the serious accusations leveled against him. Finally, the management of the hospital conducted absolutely no investigation, apart from considering Powanda's report. The jury reasonably could have concluded that this report was exceedingly flimsy, and that it contained nothing more reliable than hearsay piled upon hearsay: Powanda merely presented Gurdak's cursory and unreliable memo, which in turn purported to paraphrase the statements of six "witnesses" who were not in the room during the incident and two others who did not accuse the plaintiff of any impropriety.

Based upon all of the evidence, the jury reasonably could have concluded that the defendant terminated the plaintiff without just cause. Accordingly, the jury reasonably could have concluded that the defendant breached its implied contract with the plaintiff.[22]

## II

In its letter of termination, the defendant accused the plaintiff of "display[ing] bad judgment and [violating]

---

[22] Because we find that the jury properly concluded that the defendant committed a breach of contract, it is unnecessary to reach the issue of whether the defendant also committed a breach of the implied covenant of good faith and fair dealing.

established procedures regarding restraint of a patient." The defendant does not dispute that these statements are per se defamatory, in that they "[charge] improper conduct or lack of skill or integrity in one's profession or business and [are] of such a nature that [they are] calculated to cause injury to one in his profession or business." *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 566, 72 A.2d 820 (1950). Nor does the defendant dispute that these statements were published.[23] The

[23] We recently have explained that—pursuant to the doctrine of intracorporate communication—the element of publication may be satisfied where "the statement about the [employee] ha[s] been communicated among the [employee's] supervisors and ha[s] been included in the [employee's] personnel file." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 27. In the present appeal, at least three of the plaintiff's supervisors read the letter: Powanda drafted it, Yankowski signed it, and Gurdak delivered it. Furthermore, the letter was placed in the plaintiff's personnel file. These facts justify the court's instruction, in its interrogatories to the jury, that the requirement of publication is satisfied "where a defamatory statement is communicated among the [employee's] supervisors and is included in his personnel file . . . [and that] the evidence showed that there was such communication and [that] the defamatory letter was put in the plaintiff's personnel file." The defendant did not take exception to this interrogatory; nor did the defendant take exception to the portion of the court's jury instruction containing similar language. From this silence we infer that the defendant was satisfied that the instruction and the attendant interrogatory were adequate to protect its interests. *Holbrook* v. *Casazza*, 204 Conn. 336, 346 n.3, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988).

The defendant has not challenged either this instruction or this interrogatory on appeal. Instead, the defendant has limited its discussion of publication to the argument that "the element of publication could not have been satisfied *pursuant to the doctrine of compelled self-publication*." (Emphasis added.) See, e.g., J. Acevedo, "The Emerging Cause of Action for Compelled Self-Publication Defamation in the Employment Context: Should Connecticut Follow Suit?," 72 Conn. B.J. 297 (1998) (discussing doctrine, pursuant to which "an employee who is discharged and given allegedly defamatory reasons for the termination is afforded a cause of action sounding in defamation, if foreseeable that he would be forced to repeat the defamatory statement to third parties [like potential employers] during the course of subsequent job interviews"). Accordingly, the defendant tacitly concedes that the plaintiff has satisfied the element of publication *pursuant to the doctrine of intracorporate communication.* Because the element of publication has been satisfied in the present appeal through the doctrine of intra-

defendant's sole defense consists of the observation that it possessed a qualified privilege and the argument that the jury could not reasonably have concluded that the defendant abused this privilege. The defendant's threshold observation is correct. "[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a *qualified* privilege." (Emphasis added.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 29. The defendant's argument that it did not abuse this privilege, however, is unavailing.

Although a qualified privilege insulates many defamatory statements and shields many defendants from liability, the privilege does not protect a defendant who makes statements that are both defamatory and malicious. See, e.g., id.; *Bleich* v. *Ortiz*, 196 Conn. 498, 504, 493 A.2d 236 (1985); 3 Restatement (Second), Torts § 600 (1977). For the reasons previously discussed, the jury reasonably could have determined that the defendant acted with malice by publishing the letter. More specifically, the jury "reasonably could have inferred from the evidence that the defendant's agents published a false statement in order to effectuate the plaintiff's discharge, even though they doubted the statement's veracity.[24] See *Woodcock* v. *Journal Publishing Co.*, 230

corporate communication, we decline to reach the issue of whether the element of publication could also have been satisfied by recourse to the emerging doctrine of compulsory self-publication.

[24] The defendant asserts that the trial court's determination that the defendant possessed a qualified privilege necessarily established "that the [defendant] acted in good faith in making its statement," because one of the elements of a qualified privilege is that the statement must be made in good faith. This misstates our law. In *Miles* v. *Perry*, 11 Conn. App. 584, 594 n.8, 529 A.2d 199 (1987)—the only case that the defendant has cited in support of this proposition—the Appellate Court explained our law as follows: "A conditional or qualified privilege may be *abused or lost* if the defendant published or broadcast the defamatory remarks with malice, improper motive, or bad faith. *Atwater* v. *Morning News Co.*, 67 Conn. 504, 513, 34 A. 865 (1896)." (Emphasis added.) As *Miles* makes clear, the presence of a qualified privilege does not preclude a subsequent finding that the defendant

Conn. 525, 527, 646 A.2d 92 (1994) (in suit by public figure against media defendant, finding of actual malice permissible when there is 'sufficient evidence to permit the [inference] that the defendant in fact entertained serious doubts as to the truth of his publication')." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 30; see *Bleich* v. *Ortiz*, supra, 504 ("malice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive").[25] Accordingly, we conclude that there was sufficient evidence to support the jury's finding that "the statements made by the defendant in the letter terminating the plaintiff's employment [were] made maliciously or for an improper or unjustifiable motive."

## III

The defendant claims that the trial court abused its discretion in several of its evidentiary rulings.[26] We do not agree.

It is well settled that "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference.

did not act in good faith. Instead, under our law, there are two consecutive inquiries: (1) does the defendant possess a qualified privilege? and (2) if so, is the defendant liable—notwithstanding its qualified privilege—because it did not act with the requisite level of good faith?

[25] The defendant claims that the court incorrectly permitted the jury to determine whether it had abused its qualified privilege, for the following reason: "[t]he sufficiency of [the] defendant's investigation conducted prior to making the allegedly defamatory statement is relevant only to the issue of whether *the statement was privileged,* not the issue of whether that privilege was *abused,* i.e., whether the statement was made with actual malice." (Emphasis added.) We are not persuaded. An employer may manifest malice in a variety of ways. In the present case, the jury reasonably could have concluded that the malice of the defendant inhered in the fact that it was so concerned about avoiding legal liability that it terminated an innocent employee on the basis of nothing more than a cursory and unreliable memo. For this reason, the defendant is simply incorrect to assert that the inadequacy of this "investigation" does not supply evidence of malice.

[26] Only one of the defendant's evidentiary complaints merits discussion in the body of our opinion. We address the defendant's two remaining evidentiary claims in footnote 29 of this opinion.

*State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . [Its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make *every reasonable presumption* in favor of upholding the trial court's ruling, and only upset it for a *manifest abuse of discretion. . . . State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990) . . . . *State* v. *Beliveau*, 237 Conn. 576, 592, 678 A.2d 924 (1996); *State* v. *Colton*, 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996)." (Emphasis added; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998); see *Casalo* v. *Claro*, 147 Conn. 625, 630, 165 A.2d 153 (1960) (discussing "fundamental rule of appellate procedure in the review of evidential rulings . . . that [a party] has the burden of establishing that there has been an erroneous ruling which was probably harmful to him"); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 3.5.10, citing *Casalo* v. *Claro*, supra, 630.

The defendant claims that the trial court abused its broad discretion by excluding the testimony of an expert retained by the defendant, who would have testified about the lingering effects of steroids upon the plaintiff (who had not used such substances during the entire year preceding the incident).[27] Although the

---

[27] The defendant asserted the following arguments in support of its evidentiary challenge: "[The] [p]laintiff opened the door to the admissibility of this evidence through rebuttal testimony and on cross-examination when he testified about what influenced his state of mind on the evening of the incident. . . . [The] plaintiff also testified that, on the evening of the inci-

defendant could have raised this issue beginning in 1991, it did not give notice to the plaintiff until August 19, 1996—four days prior to the trial management conference and less than thirty days before the trial was scheduled to commence—even though the expert was a member of the hospital's staff. The trial court concluded that this testimony would have been "highly prejudicial."[28] The court was well within its discretion to prevent this kind of ambush. See, e.g., *Berry* v. *Loiseau*, 223 Conn. 786, 800, 614 A.2d 414 (1992) ("A trial court's decision on whether to impose the sanction of excluding the testimony of a party's expert witness rests within the court's sound discretion. . . . The action of the trial court is not to be disturbed unless it has abused its broad discretion, and in determining whether there

dent, he was not in complete control of his faculties because he was tired and on medication. . . . Further, he stated the termination of his employment caused him anxiety, he could no longer engage in bodybuilding competitions, and he lost weight after his discharge. . . . The plaintiff testified he recently underwent surgery to drain fluids from his enlarged chest." (Citations omitted; internal quotation marks omitted.)

[28] In his motion to preclude the defendant's expert, the plaintiff explained that the following prejudice would arise if the defendant were permitted to introduce its untimely evidence: "(a) The plaintiff will be required to conduct further discovery, which discovery may include a deposition of the expert in order to properly prepare for the cross-examination of [the] defendant's expert; and (b) [t]he plaintiff may be required to hire and disclose his own expert . . . ." The plaintiff further argued that the defendant's "disclosure of its expert at this late stage will unduly interfere with the orderly progress of trial in that in order for [the] plaintiff to adequately prepare, a continuance will be required so that [the] plaintiff may conduct further discovery and determine whether [the] plaintiff will require his own expert. As this matter has been pending [for five years], [the] plaintiff does not want to seek a continuance unless compelled to do so by the court's refusal to preclude the testimony of [the] defendant's expert." Finally, the plaintiff emphasized that the defendant's "late disclosure of its expert suggests a bad faith delay on the part of the defendant in that [the] expert . . . is an employee of the defendant. As such, the defendant, a health care provider, could easily have disclosed its expert much earlier in these proceedings. [The] [p]laintiff submits that [the] defendant's attempt at disclosure of its expert at this late date is an attempt at placing the plaintiff in a disadvantageous position immediately prior to trial."

has been such abuse every reasonable presumption should be made in favor of its correctness. . . . *Pool* v. *Bell*, 209 Conn. 536, 541, 551 A.2d 1254 [1989]; see also *Mulrooney* v. *Wambolt*, 215 Conn. 211, 221–22, 575 A.2d 996 [1990]." [Internal quotation marks omitted.]); Practice Book § 13-4 (4) ("Each defendant shall disclose the names of his or her experts . . . within a reasonable time prior to trial. If . . . an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert *shall not testify* if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure [A] will cause undue prejudice to the moving party; or [B] will cause undue interference with the orderly progress of trial in the case; or [C] involved bad faith delay of disclosure by the disclosing party." [Emphasis added.]).[29]

---

[29] The defendant also challenges the correctness of two other evidentiary rulings; neither complaint merits much attention. First, the defendant claims that the trial court abused its discretion by admitting the plaintiff's "unduly prejudicial" testimony that a police officer stated that the patient had "a tendency in aggressiveness towards law enforcement officers, where he likes to fight with the polic[e,] and . . . [that he is] very aggressive towards cops and security." Even if the court was incorrect to permit this testimony into evidence, the mistake was harmless. The court expressly instructed the jury that this testimony "is not being offered for the truth [of the patient's predisposition]. . . . Again, it's not being offered for the truth and can not be used by you to determine what, in fact, the conduct of the patient was or [the plaintiff's] conduct was during this incident." Perhaps more importantly, the jury reasonably could have concluded from a great deal of other testimony that the patient was extremely aggressive. In light of this fact, we are unable to detect the "unduly prejudicial" impact of the prescient testimony of a police officer.

Second, the defendant claims that the jury's determination of whether the defendant was bound by an implied contract was tainted by the court's decision to admit evidence of the defendant's past disciplinary practices. This argument ignores the court's express instruction to the jurors that they could *not* "conclude that a contract existed in this case because . . . at times prior to the plaintiff's termination the hospital chose to use the disciplinary procedure set forth in the [manual] with regards to other employees. That is, if the language of the manual cannot be read as an agreement by the hospital to bind itself . . . in the way it disciplined employees . . . then its [past] decision[s] to use disciplinary procedures [set forth] in the

## IV

Finally, the defendant challenges the jury's award of both noneconomic damages and economic damages as excessive. We consider each aspect of this challenge separately.

## A

The defendant claims that the jury's award of $100,000 in noneconomic damages[30] was excessive.[31] We are not persuaded.

"Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right is 'one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court.' *Camp* v. *Booth*, 160 Conn. 10, 13, 273 A.2d 714 (1970); *Seals* v. *Hickey*, [186 Conn. 337, 352, 441 A.2d 604 (1982)]; *Zarrelli* v. *Barnum Festival Society, Inc.*, 6 Conn. App. 322, 326,

---

manual would be actions taken solely at its discretion, not binding the hospital to use such procedures or limit[ing] its right to terminate as to any other employees including [the plaintiff]." Significantly, the plaintiff refers to this instruction in his brief, and the defendant has not replied. We infer from this silence that the defendant was unable to come up with even a plausible rejoinder, let alone a persuasive one.

[30] The court instructed the jury as follows on the issue of noneconomic damages: "[N]oneconomic damages . . . means compensation for nonmonetary or nonpecuniary loss.

"As to the defamation claim, the plaintiff is entitled to recover for damage to his reputation. You must consider the time, place and manner of the making of the statement, how much publicity resulted, and all the circumstances surrounding the statement and its publication.

"In addition to damages for the injury to the plaintiff's reputation itself, the plaintiff is entitled to recovery for any emotional or mental distress resulting to him naturally from the defamation. This would include any anxiety, humiliation or wounded feelings that you find established by the evidence relating to the defamation."

[31] See footnote 6 of this opinion.

505 A.2d 25, cert. denied, 200 Conn. 801, 509 A.2d 516 (1986). The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. *Herb* v. *Kerr*, 190 Conn. 136, 139, 459 A.2d 521 (1983); *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 342, 430 A.2d 1 (1980). The size of the verdict alone does not determine whether it is excessive. 'The only practical test to apply . . . is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption.' *McKirdy* v. *Cascio*, 142 Conn. 80, 86, 111 A.2d 555 (1955); *Herb* v. *Kerr*, supra [139]; *Kiniry* v. *Danbury Hospital*, 183 Conn. 448, 461, 439 A.2d 408 (1981); *Katsetos* v. *Nolan*, 170 Conn. 637, 656, 368 A.2d 172 (1976)." (Citations omitted.) *Mather* v. *Griffin Hospital*, supra, 207 Conn. 138–39; see *Bartholomew* v. *Schweizer*, 217 Conn. 671, 687, 587 A.2d 1014 (1991). As is the case with all questions involving the sufficiency of the evidence, "[t]he trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. . . . It is the function of this court to determine whether the trial court abused its discretion . . . ." (Citations omitted; internal quotation marks omitted.) *Mather* v. *Griffin Hospital*, supra, 139.

In the context of per se defamatory statements such as those contained in the plaintiff's letter of termination, " 'the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it.' *Urban* v. *Hartford Gas Co.*, 139 Conn. 301, 308, 93 A.2d 292 (1952)." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 35. The defendant does not dispute that this is the governing standard of law. Nor does the defendant

dispute that the jury reasonably could have concluded that the presumed injury inflicted upon the plaintiff was substantial.

The defendant nevertheless attempts to evade liability for its defamatory statements by claiming that "the only [noneconomic] damages . . . that [the] plaintiff even claimed [that] he suffered were all consequences of his *discharge*; [therefore] none [was] claimed as [a consequence] of *defamation*." (Emphasis added.) This claim is foreclosed by our opinion in *Torosyan*. As in *Torosyan*, the trier of fact in the present case "found that, as a result of the defamation and the resulting discharge, the plaintiff suffered not only loss of income, but also suffered emotional distress, embarrassment, anxiety and humiliation . . . ."[32] (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 34. As in *Torosyan*, the noneconomic damages that the defendant inflicted upon the plaintiff in the present appeal are compensable.

For the reasons discussed previously, the jury reasonably could have concluded that the plaintiff was emotionally devastated in the wake of the defendant's defamation. As a result of his depression, a romantic relationship terminated, and the plaintiff lost a substantial amount of weight. Indulging every reasonable presumption in favor of both the verdict and the court's decision not to set that verdict aside, we are unable to say that the amount of the award of noneconomic damages " 'shocks [our] sense of justice.' " *Mather* v. *Griffin Hospital*, supra, 207 Conn. 139; see, e.g., *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 34–35 (summarily upholding $45,000 award of noneconomic damages for defamation). The

---

[32] See footnote 30 of this opinion for the court's instruction to the jury on the issue of noneconomic damages.

defendant has provided us with no persuasive reason to disturb the work of either the jury or the trial court with respect to noneconomic damages, and our independent review of the record has not disclosed any.

### B

The defendant's final claim is that the jury's award of $100,000 in economic damages[33] was exces-

---

[33] The court instructed the jury as follows on the issue of economic damages: "Economic damages means compensation for pecuniary or monetary loss. If you conclude by a preponderance of the evidence that the plaintiff has established any one of his claims for breach of contract [or] breach of the implied covenant of good faith and fair dealing, the plaintiff is entitled to recover damages equal to the wages he has lost due to the termination, including any bonuses due and compensation for loss of benefits for the term of his employment, less amounts he has earned or could have reasonably earned by due diligence in securing suitable employment of a similar type and with similar compensation. In other words, the plaintiff can recover the wages he would have earned had he not been terminated, minus any wages he earned or could have earned elsewhere and the burden of proof of the latter is upon the employer.

"As to the defamation claim, the plaintiff claims he had great difficulty in securing employment upon his termination, after these statements were made. The plaintiff has a right to recover for any loss of wages that were a direct and natural consequence of any defamatory statements made by the defendant. But again, here the defendant may show that any such claim should be reduced if the defendant persuades you that the plaintiff did not mitigate or reduce his damage claim by due diligence in securing other employment.

"On an award for economic damages, you may also award interest at the legal rate of 10% per annum as additional damages.

"Such interest runs from the time the money was due. Therefore, if you find for the plaintiff on the issue of economic damages and award damages for the loss of pay you find that the plaintiff suffered, you may add to such damages interest at the rate of 10% per year from the date the loss of pay was suffered.

"Also, I instruct you that, as to the economic damage claim, that there is no claim for damages for loss of pay beyond December of 1992, in view of the fact that after December 31, 1992, the plaintiff's earnings have not suffered.

"Now, as to economic damages, the plaintiff is not entitled to multiple recovery—if the plaintiff proves any one, more than one, or all of his claims as a basis for economic damages, he is still entitled to one recovery for economic damages."

sive.[34] We agree, and order a remittitur.

Notwithstanding the highly deferential standard set forth previously, "[a] verdict may be excessive if it includes an award for an element of damages which was not proven. . . . *Adams* v. *New Haven*, 131 Conn. 552, 555, 41 A.2d 111 [1945]; *Bushnell* v. *Bushnell*, 103 Conn. 583, 596, 131 A. 432 [1925]." (Citation omitted.) *Healy* v. *White*, 173 Conn. 438, 441–42, 378 A.2d 540 (1977). "When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. *Simone Corporation* v. *Connecticut Light & Power Co.*, 187 Conn. 487, 495, 446 A.2d 1071 (1982); *Bianco* v. *Floatex, Inc.*, 145 Conn. 523, 525, 144 A.2d 310 (1958). Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. *Humphrys* v. *Beach*, 149 Conn. 14, 21, 175 A.2d 363 (1961); *Gargano* v. *Heyman*, [203 Conn. 616, 621, 525 A.2d 1343 (1987)]; *Simone Corporation* v. *Connecticut Light & Power Co.*, supra, 494–95; *Bronson & Townsend Co.* v. *Battistoni*, 167 Conn. 321, 326–27, 355 A.2d 299 (1974); *Anderson* v. *Zweigbaum*, 150 Conn. 478, 482, 191 A.2d 133 (1963). *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut*, 218 Conn. 474, 476–77, 590 A.2d 431 (1991)." (Internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 308–309, 685 A.2d 305 (1996).

The defendant concedes that, if it breached an implied contract, then it is liable to the plaintiff for $60,911 of economic damages. This figure represents the sum of $38,632 (the plaintiff's net lost wages) and $22,279 (interest to the date of judgment). The jury, however, awarded the plaintiff $100,000 in economic damages. The defendant argues that the plaintiff is not

---

[34] See footnote 6 of this opinion.

entitled to $39,089—the difference between the award of economic damages and $60,911. We agree.

The plaintiff has not identified anything in the record from which the jury reasonably could have concluded that he incurred nearly $40,000 in economic damages above and beyond back pay and the interest accrued thereon. In its memorandum denying the defendant's posttrial motions, the trial court failed to identify any evidence in support of this aspect of the award, and our independent review of the record has not disclosed any. All that we have before us are the speculative and vague hypotheses that the plaintiff has advanced before this court in order to account for the $40,000 windfall that he has received. Even when they are viewed in the light most favorable to the plaintiff, these hypotheses are not sufficient to support the disputed portion of the verdict.[35] For this reason, we find that this aspect of the verdict does not reflect the requisite quantum of "reasonable certainty," notwithstanding the deference that we owe to the work of both the jury and the trial court.

Accordingly, we affirm the verdict rendered by the jury and endorsed by the trial court, except with respect to the portion of the economic damages discussed in this opinion. The trial court shall set aside the judgment awarding economic damages unless the plaintiff shall—within ten days from the date that this opinion is published—file a remittitur of $39,089.[36] In the event that

[35] For example, the plaintiff hypothesizes in his brief that the jury may have attempted to compensate him for "cost of living increases . . . ." The plaintiff did not, however, introduce any evidence with respect to such income at trial, and the court gave the jury no instruction on such income. In addition, the plaintiff refers to various benefits that he enjoyed while employed by the defendant. He does not, however, identify any portions of the record from which the jury reasonably could have concluded that the plaintiff incurred nearly $40,000 in economic damages from the loss of these benefits.

[36] As early as 1930, this court explained that "we have [frequently] ordered a new trial unless the plaintiff would remit a part of the verdict. Our right

the plaintiff fails to file a remittitur within this period of time, then the judgment awarding economic damages is set aside and a retrial is ordered, limited to the issue of economic damages.

The judgment is affirmed with respect to the award of noneconomic damages and, consistent with the preceding paragraph, the case is remanded for further proceedings with respect to the award of economic damages.

In this opinion KATZ and PETERS, Js., concurred.

CALLAHAN, C. J., with whom MCDONALD, J., joins, dissenting. "[A]s a general rule, contracts of permanent employment, or for an indefinite term, are terminable at will. *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 211 n.1, 520 A.2d 217 (1987). Pursuant to traditional contract principles, however, the [general] rule of employment at will can be modified by the agreement of the parties. Id. Accordingly, to prevail on the . . . count of his complaint [that] alleged the existence of an implied agreement between the parties, the plaintiff had the burden of proving by a fair preponderance of the evidence that [the employer] had agreed, either by words or action or conduct, to undertake [some] form of actual contract commitment to him under which he could not be terminated without just cause. [Id.], 212 n.2; *Therrien* v. *Safeguard Mfg. Co.*, [180 Conn. 91, 94–95, 429 A.2d 808 (1980)]." (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 14–15, 662 A.2d 89 (1995). Although as a practical matter, "[b]y eschewing language that could reasonably be construed as a basis for a contractual promise, or by including appropriate disclaimers of the intention to contract, employers can protect themselves against

---

to do so in a proper case is undoubted . . . ." *Doroszka* v. *Lavine*, 111 Conn. 575, 579, 150 A. 692 (1930).

employee contract claims based on statements made in personnel manuals"; *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 199 n.5, 520 A.2d 208 (1987); it is the actual terms of the employee manual, not the absence of disclaiming language, that gives rise to a contractual obligation not to discharge an employee without just cause. The burden, moreover, is on the employee to demonstrate that the terms of the employee manual establish the existence of such a commitment on the part of the employer. *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 15.

"[T]he determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact. As an inference of fact, it is not reversible [error] unless the [trier of fact] could not reasonably have arrived at the conclusion that it reached. *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981). . . . *Coelho* v. *Posi-Seal International, Inc.*, 208 Conn. 106, 112–13, 544 A.2d 170 (1988); see also *Finley* v. *Aetna Life & Casualty Co.*, [supra, 202 Conn. 198] (whether employment manual becomes term of implied contract of employment is question of fact)." (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 15. "[O]ur role [moreover] is not to retry the facts. 'A finding of fact is clearly erroneous [only] when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993); *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992)." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 16. In light of the factual record in the present case, I agree with the majority that the jury's finding regarding

the existence of an implied contract not to terminate the employment of the plaintiff, Brian Gaudio, without just cause and in accordance with the provisions of the policies and procedures manual (manual) of the defendant employer, Griffin Health Services Corporation, was not clearly erroneous.

The defendant, however, challenges the jury's finding that the defendant breached that implied employment contract on four grounds. Specifically, the defendant claims that: (1) as a matter of law, the manual did not obligate it to provide the plaintiff with three step progressive discipline; (2) the trial court improperly permitted the jury to review de novo the defendant's determination that the plaintiff had assaulted a patient; (3) there was not sufficient evidence to submit to the jury the count alleging breach of the covenant of good faith and fair dealing; and (4) as a matter of law, the defendant's statements to the plaintiff were privileged and, therefore, do not constitute a basis for a finding that the defendant defamed the plaintiff.

I

I begin with the defendant's claim regarding three step progressive discipline. The provisions concerning discipline set forth in the manual provide in relevant part: "When it becomes necessary to impose a formal disciplinary action regarding employees who fail to observe hospital rules, regulations or policies, the steps outlined in this policy shall serve as a *guideline* for disciplinary action.

"It must be recognized that each situation is different and requires individual evaluation. Among the factors that should be considered in determining the action to be taken are *seriousness*, frequency and *nature of the violation*, length of service, work history and customary disciplinary practices.

"The policy outlines the progressive steps of the normal disciplinary process. *It must be emphasized, however, that discipline may begin at any step in the procedure depending on the seriousness of the offense.* . . .

"Following are the steps of the disciplinary process:

"Step I—DOCUMENTED VERBAL WARNING . . .

"Step II—FORMAL WRITTEN WARNING . . .

"Step III—SUSPENSION OR DISCHARGE

"Repeated violations or *incidents involving serious misconduct . . . may justify suspension without pay or discharge.* . . .

"Suspension or discharge actions may be imposed only with the prior discussion and approval of the Personnel Director and the Administrative staff member responsible for the department.[1]

"The only condition that would permit suspension of an employee without prior approval is where an action or violation of such severity takes place that the immediate removal of the employee from the hospital premises is indicated. In such situations, the suspension period shall be used for investigation and gathering of facts

---

[1] The plaintiff argued at trial that the defendant had breached the implied contract of employment in two additional ways: (1) by discharging him without prior discussion with, and approval by, Janice Yankowski, the defendant's director of human resources; and (2) by failing to complete a form. The jury interrogatories, however, did not address those alleged procedural breaches. Furthermore, as a matter of law, neither the alleged failure to obtain Yankowski's approval nor the alleged failure to complete a form is capable of supporting the jury's award of damages in the present case. Finally, the record reveals that Yankowski was aware of the plaintiff's discharge and was in fact the person who signed the letter informing the plaintiff that his employment had been terminated. Thus, the record does not permit a finding that the defendant discharged the plaintiff without Yankowski's knowledge and approval.

that would result in a decision as to the Disciplinary Action to be taken. . . ." (Emphasis added.)

In its instruction to the jury the court stated in relevant part: "The plaintiff claims the defendant hospital breached the contract of employment because . . . he did not receive the progressive disciplinary procedure set forth in the contract. . . . The plaintiff . . . claims the personnel manual dealing with employee discipline formed a contract obligating the hospital to follow a three step disciplinary procedure before terminating the plaintiff's employment. . . . [I]f you conclude there was a contract and the contract provided for progressive discipline, then *you must decide whether . . . all three steps had to be followed.*" (Emphasis added.) In its answers to the special interrogatories, the jury found that the implied employment contract entitled the plaintiff to progressive discipline and that the defendant had terminated the plaintiff's employment without providing him with the progressive discipline to which he was contractually entitled.

In my view, no reasonable juror could conclude, on the basis of the disciplinary provisions set forth in the manual—provisions that explicitly state that *"discipline may begin at any step of the procedure depending on the seriousness of the offense"*—that the defendant promised not to discharge an employee for serious misconduct such as a patient assault without first providing that employee with three step progressive disciplinary measures. Consequently, I believe that the trial court's submission of this issue to the jury was improper and that the jury's finding that the defendant had breached the implied employment contract by not providing the plaintiff with three step progressive discipline is clearly erroneous.

## II

The defendant next claims that the trial court improperly permitted the jury to review de novo the defendant's determination that the plaintiff had assaulted a patient. In its instruction to the jury, the court, over the objection of the defendant, stated: "First, as to just cause . . . [y]ou must decide here whether the hospital had just cause to terminate the plaintiff.

"Now I am not going to review *the conflicting evidentiary claims here as to what actually happened in the emergency room on the night in question* and the manner in which [Raymond] Gurdak conducted his investigation and whether he did so properly.

"The question becomes how do you apply the just cause concept here? . . . You must examine the investigation procedure . . . and information utilized by the hospital . . . in the meeting called by [William C.] Powanda where it was decided to terminate the plaintiff, to determine whether the employer acted in an arbitrary or capricious manner.

"The employer must provide a reason for the dismissal . . . and cannot arbitrarily or capriciously terminate an employee. These considerations are the basis on which you determine whether there was just cause for termination of the plaintiff.

"Nevertheless . . . an employer rightfully has managerial discretion in making such decisions and the right *to make independent, good faith judgments.* In making your decision, you cannot interfere with the legitimate exercise of managerial discretion.

"But again, the words 'good faith' and 'lack of arbitrary' and 'capricious' action are important. Recognizing the right to make good faith determinations about personnel and the need to give management discretion in these areas so that the courts and/or juries don't start

micro managing companies, *you still must decide whether on the facts of this case* the manner in which the investigation was conducted and the decision to terminate that was made was so arbitrary, capricious or lacking in good faith so as to warrant you in concluding that the termination was not made for just cause." (Emphasis added.) Thus, the trial court's instruction to the jury indicated that, in deciding whether the defendant had had just cause to terminate the plaintiff's employment, the jury properly could weigh evidence that indicated that the plaintiff did not assault the patient.

In interpreting the parameters of an employer's implied contractual obligation not to terminate employment without just cause, however, I do not think that an implied agreement to relinquish completely its fact-finding discretion reasonably can be imputed to an employer unless there is specific language indicative of such intent in the employee handbook. In my view, the proper standard for determining the existence of just cause is not whether the employer correctly concluded that the employee had engaged in misconduct; rather, it is whether the employer had a good faith and reasonable belief, based upon substantial evidence, that the employee had done so. See *Cotran* v. *Rollins Hudig Hall International, Inc.*, 17 Cal. 4th 93, 948 P.2d 412, 414, 69 Cal. Rptr. 2d 900 (1998) (proper inquiry not whether discharged employee committed act that led to discharge, but reasonable belief of employer); *Southwest Gas Corp.* v. *Vargas*, 111 Nev. 1064, 1078, 901 P.2d 693 (1995) (same); *Kestenbaum* v. *Pennzoil Co.*, 108 N.M. 20, 27, 766 P.2d 280 (1988) (same); *Simpson* v. *Western Graphics Corp.*, 293 Or. 96, 100–101, 643 P.2d 1276 (1982) (same); *Baldwin* v. *Sisters of Providence in Washington, Inc.*, 112 Wash. 2d 127, 139, 769 P.2d 298 (1989) (same). Thus, I would conclude that the trial court's instruction allowing a de novo review of the

existence of just cause at least entitles the defendant to a new trial on the breach of implied contract count.

Furthermore, the reason the defendant proffered for its decision to terminate the plaintiff's employment was that it believed that the plaintiff, a body builder, had assaulted a patient in the emergency room, a belief that, if justified, obviously constitutes just cause for discharge. In my view, no reasonable juror could conclude, on the basis of the information provided to the defendant on the night of the incident by members of the hospital staff, and in light of the patient's medical record—a record that indicates that the patient sustained lacerations of his face and loosening of his teeth during the incident in the emergency room and, therefore, supports a conclusion that the patient was struck in the face—that the defendant lacked reasonable grounds to believe that the plaintiff had assaulted the patient by striking him in the face. Specifically, various hospital personnel who had witnessed the incident stated to Gurdak that "I saw [the defendant] holding down a patient to the [stretcher]. The patient was fighting and swearing, and spit at the guard. The security guard struck the patient in the face, the patient spit (blood) back at him and the guard struck him again. The patient stated [to the doctor], 'doctor please don't go they're trying to kill me' "; that "[t]he patient was extremely violent, I saw the guard hit the patient and the patient spit blood back at him. The guard pushed the patient's face to the side to try to control him"; that "I saw [the plaintiff] on top of a patient hitting him"; that "[the plaintiff] put a sheet over [the patient's] mouth because he was spitting blood, then he jumped on him and hit him in the face"; and that "[the plaintiff] then got on top of the patient and tried to restrain him, the patient got hit with a blow to the head, during the scuffle." The plaintiff was given an opportunity to respond to these accusations by filing an incident report

detailing his version of the events that had transpired in the emergency room. The plaintiff's report, which acknowledged that the plaintiff had knocked the patient down, did little to allay the defendant's reasonable belief that the plaintiff had struck the patient. In my view, the defendant, who knew the people who provided the statements and, therefore, possessed information regarding their credibility that would not be available to a jury, was entitled to credit these statements and disbelieve the plaintiff's version of events. Further, I believe that the information provided to the defendant by witnesses to the incident, as a matter of law, provided the defendant with just cause to terminate the plaintiff's employment. It strikes me that if the defendant had ignored that substantial evidence that the plaintiff had assaulted a patient and instead had retained the plaintiff and permitted other patients to come into contact with him, and if there then had been another similar incident involving the plaintiff, the defendant would have been severely criticized and likely would have been held liable, possibly for punitive damages, for its failure to ensure the safety of the patients it serves. Thus, in my view, the defendant is entitled to a directed judgment on the breach of implied contract count.

III

The defendant next claims that there was not sufficient evidence to submit to the jury the count alleging breach of the covenant of good faith and fair dealing. Here, too, I agree. "The two principles that govern [this] claim are undisputed. 'Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.' *Habetz* v. *Condon*, 224 Conn. 231, 238, 618 A.2d 501 (1992). 'Bad faith means more than mere negligence; *it involves a dishonest purpose.*' Id., 237." (Emphasis

added.) *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 598, 687 A.2d 111 (1996). The plaintiff did not offer any evidence capable of supporting the conclusion that the defendant acted dishonestly when it terminated the plaintiff's employment. The presence of the defendant's risk manager at the meeting at which the decision was made to terminate the plaintiff's employment, a prudent and proper exercise of business judgment, and evidence that the defendant was concerned that the patient would bring a lawsuit against the hospital as a result of the incident in the emergency room, are incapable of supporting a conclusion that the defendant acted with "furtive design or ill will" when, on the basis of the information provided to it by hospital personnel in the emergency room on the night of the incident, it terminated the plaintiff's employment. See *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596 (1987). In fact, the defendant's termination of the plaintiff's employment as a result of the incident in the emergency room could only serve to expose the defendant to, rather than shield it from, liability for the plaintiff's actions. In my view, the defendant is entitled to a directed judgment on this count.

## IV

Finally, the defendant claims that the trial court improperly submitted to the jury the question of whether the defendant's statements to the plaintiff were privileged and, therefore, could not constitute a basis for a finding that the defendant had defamed the plaintiff. See *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 27. Because I believe that the defendant is entitled to a directed judgment on the counts alleging breach of an implied contract and breach of the implied covenant of good faith and fair dealing, I also believe that, as a matter of law, the

defendant's statements concerning the plaintiff—statements that were based upon a reasonable belief, supported by substantial evidence, that the plaintiff had assaulted a patient—were privileged. See id., 29; see also *Petyan* v. *Ellis*, 200 Conn. 243, 247–48, 510 A.2d 1337 (1986) (employer's statements in unemployment compensation form regarding reasons for employee's discharge are absolutely privileged). Consequently, in my view, the defendant also is entitled to a directed judgment on the defamation count. I, therefore, respectfully dissent.