[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR REMITTITUR
On July 25, 2001, the jury in this case returned plaintiff's verdicts for the counterclaim and third-party plaintiffs ("plaintiffs"), Samad Aghamohammadi ("Mr. Agha") and Pamela Markham ("Ms. Markham"), against their former employer, counterclaim defendant Label Systems Corporation ("Label Systems"), and its president, third-party defendant Kenneth P. Felis ("Mr. Felis"), on the plaintiffs' claims of vexatious suit under General Statutes § 52-568.[1] By its verdicts, the jury found that from April 22 through August 18, 1993, following the plaintiffs' February CT Page 9102 15, 1993 terminations by Label Systems for alleged wilful and felonious misconduct, the defendants subjected the plaintiffs to vexatious suits by commencing and prosecuting appeals from their April 7, 1993 awards of unemployment compensation benefits without probable cause. As a result of the defendants' maintenance of those appeals — which they later withdrew unilaterally, after three separate days of evidentiary hearings, on August 18, 1993 — the jury found that the plaintiffs had sustained injuries and losses which entitled them to the following compensatory damages: $60,000 for Mr. Agha and $160,000 for Ms. Markham. Accordingly, upon further determining that the subject appeals, though commenced without probable cause, had not been prosecuted "with a malicious intent to unjustly vex and trouble" the plaintiffs, the jury returned verdicts doubling rather than trebling their compensatory damages: $120,000 for Mr. Agha and $320,000 for Ms. Markham. These awards, in fact, were the plaintiffs' only awards of damages on their counterclaim and third-party claim, for the jury simultaneously rejected all of their other remaining claims.[2]
Following the trial, the defendants moved this Court for remittiturs on the plaintiffs' vexatious suit claims and moved for a new trial on several grounds, including the plaintiffs' anticipated failure to accept remittiturs in the event they were ordered as requested. The parties have submitted several legal memoranda in support of and in opposition to these motions, and have twice been heard in oral argument thereon.
In their motions and memoranda, the defendants present two basic arguments why remittiturs should be ordered in this case. First, they claim that, although the record contains substantial evidence that both Mr. Agha and Ms. Markham ("the plaintiffs") suffered great mental and emotional distress in the wake of their February 15, 1993 terminations by Label Systems, there is only "scant" evidence of a causal connection between such distress and the commencement and prosecution of the subject appeals. The plaintiffs' post-termination suffering, the defendants contend, was actually caused by many other, prior or contemporaneous, and even more disturbing events in their lives, including: the terminations themselves, which occurred while Ms. Markham was nearing the end of a difficult pregnancy; the resulting loss of use of their company car, which they had used as their sole means of transportation throughout Ms Markham's pregnancy; the arrest of Mr. Agha, on the threatening complaint of Mr. Felis, on the evening of the terminations; the defendants' cut-off of their health insurance, and later interference with their ability to purchase COBRA benefits after their daughter was born; the defendants' initiation of this lawsuit and early attempt to obtain a prejudgment remedy against them; and the defendants' continuing prosecution of this lawsuit thereafter, for more than eight years before the start of trial. In this context, the defendants argue, their short-term prosecution of CT Page 9103 the subject appeals — for a mere four months before they were finally withdrawn — was barely a factor, and surely not a substantial factor, in causing the plaintiffs' post-termination suffering.
The defendants' second argument as to why remittiturs should be ordered in this case is that even if the evidence establishes some causal connection between their prosecution of the subject appeals and the plaintiffs' post-termination suffering, the damages here awarded — an aggregate total of $440,000 — were so excessive as to shock the sense of justice, and thus to require the ordering of remittiturs as a matter of law.
 I
To establish his entitlement to damages as a result of a defendant's tortious conduct, a plaintiff must prove by a fair preponderance of the evidence both that the defendant engaged in such tortious conduct and that that conduct proximately caused him to suffer a compensable loss or injury. In other words, he must prove it more likely than not that the defendant committed each essential element of the tort complained of, and that his commission of that tort was a substantial factor in bringing about the particular injuries and losses for which he seeks to recover damages. The determination of damages for a plaintiff's proven loss or injury is a matter for the finder-of-fact to determine. Where, as here, the parties elected trial by jury, the matter of damages is for the jury to decide.
In making their decision as to damages, however, the jurors are strictly bound by the evidence presented at trial. Thus, the only damages they may lawfully award are for injuries or losses proved to have been proximately caused by the defendants' tortious conduct, and the amount of their award, though usually not subject to calculation with mathematical certainty, must be fair., just and reasonable in light of the nature and extent of the plaintiff's proven injuries and losses. Damages, like findings of fact, must not be based on speculation.
In this case, the claims on which the jury awarded the plaintiffs damages were for vexatious suit, under General Statutes § 52-568. To prevail on a claim of vexatious suit, a plaintiff must prove by a fair preponderance of the evidence that the defendant commenced and prosecuted a civil action against him without probable cause, that that action terminated in his favor, and that the prosecution of that action proximately caused him to suffer compensable injuries or losses. Under our law, the types of injuries and losses for which a plaintiff may recover damages on a claim of vexatious suit include all costs, fees and expenses CT Page 9104 he reasonably incurred in the defense of the vexatious suit; Vandersluis v. Weil, 176 Conn. 353, 357 (1978); as well as all anxiety, pain, distress, humiliation and kindred forms of mental and emotional suffering which he has suffered as a result of that suit. Wochek v. Foley,193 Conn. 582, 588 (1984).
In this case, the record contains substantial evidence that the defendants prosecuted vexatious unemployment compensation appeals against Mr. Agha and Ms. Markham and that the prosecution of those appeals was a substantial factor in causing each of them to suffer mental and emotional distress. Mr. Agha, an immigrant from Iran, had worked almost continuously for Label Systems for over a decade by the time of his termination on February 15, 1993. A trusted employee who had been given significant responsibilities within the company, he had developed what he believed to be an excellent working relationship with its president, Mr. Felis, whom he regarded as a friend, indeed almost as a brother.
Mr. Agha also regarded Mr. Felis as a potential business partner. Thus, on more than one occasion he claims that he spoke with Mr. Felis about the possibility of going into business together. One such conversation, as Mr. Agha recalled it at trial, involved Mecca Shipping 
Trading Company ("Mecca"), an import-export company he had founded with a former Label Systems salesman, Mr. Henry Behre. Mr. Agha testified that, although Mr. Felis had no interest in joining Mecca, he both knew of its existence and allowed Mr. Agha to make limited use of Label Systems equipment and facilities, such as fax machines, to pursue it in his spare time.
Despite Mr. Agha's involvement in Mecca, that business reportedly never turned a profit. As a result, Mr. Agha's only source of income before he was terminated on February 15, 1993 was his Label Systems salary.
Ms. Markham, Mr. Agha's American-born wife, was also a long-time employee of Label Systems when she was terminated on February 15, 1993. She worked as an accountant in the upstairs office at Label Systems, keeping the corporate books and handling much of Mr. Felis' important correspondence about financial matters.
In early 1993, Ms. Markham was nearing the end of her first pregnancy. The pregnancy was a difficult one for Ms. Markham, requiring her to make many visits to her doctor, sometimes during office hours. During Ms. Markham's pregnancy, Mr. Felis was very solicitous of her needs. Not only did he continue to provide her and her husband with a company car, which they used to commute and she used to visit her doctors, but he had company computer equipment installed in her home so she could work there conveniently after the baby was born and he personally supervised the CT Page 9105 construction of a nursery for her new baby at the Label Systems facility. Plainly, she was a valued employee.
Ms. Markham's problems, however, were not limited to her difficult pregnancy. In fact, she had a longstanding problem with depression which, though it didn't typically interfere with her excellent work, made her especially vulnerable to stress and emotional upset. Throughout this period she was under the care of a psychiatrist.
Ms. Markam's only job in February of 1993 was with Label Systems. Her Label Systems salary and that of Mr. Agha constituted their entire family income.
On the day of their terminations, Mr. Agha and Ms. Markham both felt shocked and humiliated by the abrupt and entirely unjustified conduct of Mr. Felis and his staff, who confronted them outside the building as they drove up in the company car, took the keys to the car from them, handed them letters of termination which accused them of wilful and felonious misconduct in the course of their employment, and refused to let them reenter the premises to retrieve their personal belongings. On the evening of their termination, Mr. Agha was arrested based upon the claim of Mr. Felis that he had uttered a threat when he received his letter of termination. After bailing her husband out of jail, Ms. Markham returned home with Mr. Agha, where they spent the night in fear of what Mr. Felis and his associates might next attempt to do to them. Both Mr. Agha and Ms. Markam testified that they felt threatened and humiliated by the actions of Label Systems and Mr. Felis on February 15, 1993.
Eight days later, on February 23, 1993, Ms. Markham gave birth to the plaintiffs' first child, a daughter. Though both mother and child were physically healthy, Mr. Agha and Ms. Markham had no income with which to support her. In addition, they soon learned that Mr. Felis and Label Systems had cut off their health insurance benefits, and that they could not purchase a COBRA because they had been fired for alleged wilful and felonious misconduct.
To support themselves in this difficult period, Mr. Agha and Ms. Markham applied for unemployment compensation benefits. An award of benefits was made to each of them on April 7, 1993 over the objection of Label Systems. With the award, both plaintiffs began to be paid, thus making it seem possible to survive their first few months out of work. Two weeks later, however, on April 22, 1993, Mr. Felis and Label Systems filed the subject appeals from their unemployment compensation awards. In their appeals, the defendants claimed once again that the plaintiffs had been terminated for wilful and felonious misconduct. CT Page 9106
Over a four-month period, from April 22 through August 18, 1993, the defendants maintained their appeals through three evidentiary hearings where testimony was offered, by Mr. Felis and others, as to Label Systems claim that the couple had stolen large quantities of raw materials and/or finished product from Label Systems and that Ms. Markham had secretly leaked confidential company documents to Henry Behre, her husband's business partner in Mecca, to help Mr. Behre prosecute his own pending claim for back wages against Label Systems. Label Systems later withdrew both appeals, without bargain or consideration of any kind, on August 18, 1993.
To assess the true impact of the unemployment compensation appeals upon the plaintiffs, one first must consider the turbulent context in which they were initiated. In the first few weeks after their terminations, Mr. Agha and Ms. Markham were constantly anxious and upset as a result of many things. They had, to reiterate, been terminated for wilful and felonious misconduct. Mr. Agha had been arrested. This lawsuit had been filed, and a request for a prejudgment remedy was being pursued against them. In defending Mr. Agha in the criminal case and opposing the prejudgment remedy application, they had incurred substantial legal expenses. Their health insurance benefits had been cut off, and because of the alleged reasons for their termination, they were not allowed to purchase a COBRA. Then, on top of all this stress and strain, their sole source of support — their awards of unemployment compensation benefits — was directly threatened by the defendants' appeals, which, if successful, would not only terminate their benefits but require them to repay all the benefits they had thus far received. As counsel for the plaintiffs has argued in opposition to this motion, the appeals were filed and prosecuted at the worst possible time in the plaintiffs' lives.
In support of their motion, the defendants have identified several portions of the trial court record where the plaintiffs described their own and each other's reactions to the foregoing events. Though the defendants' stated purpose for focusing on this testimony was to demonstrate that the plaintiffs' suffering had many other causes than the subject appeals, the testimony actually supports the plaintiffs' claim that the prosecution of the appeals was a substantial factor in deepening and prolonging that suffering.
In Mr. Agha's testimony, for example, he made the following specific linkage between the prosecution of the unemployment compensation appeals and his personal suffering:
Q. When you found out they — Label Systems was trying to stop you from getting unemployment CT Page 9107 benefits, how did you feel?
 A. I feel terrible. First, I get fired, second they tried to attach our property, they tried to arrest us, then we went to collect a couple of dollars a week for unemployment and they came even after that, too and they cut our insurance. So how do you suppose I feel? I feel terrible.
Transcript (7/11/01), pp. 47-48. Later in his testimony he expanded on that theme as follows when asked if he felt that Mr. Felis' actions toward him had been malicious:
 Q. . . . Mr. Agha, you allege that Mr. Felis' action in terminating you and contesting your benefits and cutting your insurance and things like that were malicious, can you tell the jury why you think he was acting maliciously?
 A. Well, after we got fired and our insurance was cut, after they put a lawsuit against us, after they tried to cut our unemployment benefit and I was so frustrated, I asked Pam if it's okay if we move back home because I don't think we are going to be surviving here. And — and so we were going through a very rough time. So she didn't mind, she said if that's the way you want it, we move back because she was frustrated — that is not the country you want to live.
Transcript (7/11/01), p. 57.
The defendants argue that, in light of these answers, the plaintiffs failed to prove that their prosecution of the unemployment compensation appeals proximately caused their proven suffering. The contrary, however, is clearly true, especially since the Court must examine the evidence in the light most favorable to the non-moving party.
A tortfeasor takes his victim as he finds him. If, then, he engages in tortious conduct that injures the victim more severely because of the victim's prior injuries and subsisting vulnerabilities, he is fully responsible for any part of the victim's suffering which his tortious conduct has proximately caused.
A single injury, whether physical or emotional, may have many concurring proximate causes. Each person responsible for one of those CT Page 9108 causes is legally liable for the injury, and thus for the victim's resulting damages, if that cause was a substantial factor in bringing the injury about.
Here, to be sure, Mr. Agha's post-termination suffering had many different causes, some arising before the bringing of his unemployment compensation appeal, others arising contemporaneously with it, and still others arising after it was withdrawn. Even so, there is a substantial evidentiary basis for concluding that the bringing of that appeal, which directly threatened his family's livelihood during "a very rough time" and made him "feel terrible" — so terrible he seriously contemplated leaving the United States for Iran — was a substantial factor in deepening and prolonging his posttermination suffering. Thus, though he listed it along with other troubling events in his life in describing the feelings of frustration and despair it engendered, that certainly does not mean that it played no substantial role in causing those feelings. Instead, viewed in the light most favorable to him, his inclusion of that conduct in a list that included his termination, his arrest and his family's loss of health insurance benefits demonstrated just how significant it was, or might reasonably have been found to be, in causing his overall emotional suffering and distress.
In sum, it was for the jury to determine if the defendants' commencement and prosecution of the vexatious unemployment compensation appeal against Mr. Agha was a substantial factor in causing him emotional harm. Viewed in the light most favorable to him, the evidence well supports a finding that it was.
As for Ms. Markham, the evidence reveals that she too suffered greatly in the wake of her termination, both before and after the subject unemployment compensation appeals were filed. In the words of her husband, she has reacted as follows to the termination and its aftermath:
 Q. How is — how did the termination from Label Systems affect your wife? What did you observe?
 A. Just cried day and night, day and night. Continuously crying and holding the baby and going to the corner and just holding with the blanket and start crying and crying. I couldn't stop her and that still happens, still up to this day she's upset and she — she just wants this thing over.
Transcript (7/11/01), pp. 57-58. More than merely suggesting that Ms. Markham had an immediate reaction to her termination, this testimony by CT Page 9109 Mr. Agha suggests that the adverse effects of the defendants' behavior towards her lasted continuously thereafter, up to and including the time of trial.
This suggestion, in fact, was confirmed by Ms. Markham's own trial testimony, where she emotionally described the defendants' post-termination dealings with her and her husband as a series of assaults which both terrified and humiliated them. With particular reference to the defendants' appeals from her and her husband's unemployment compensation awards, she described her reaction to their filing as follows:
 Q. When you discovered that Label Systems was contesting your] right to collect unemployment compensation benefits, how did you feel?
 A. I felt like my throat had been ripped out. It was like they were assaulting me all over again.
Transcript (7/17/01), p. 5. Ms. Markham was well aware that if Label Systems prevailed on its appeals, she and her husband "would have to pay all the money back" that they had received in benefits even though they had a young child, mounting legal and medical bills, and no other source of income.
Ms. Markham similarly described her reaction to the filing of this lawsuit, comparing herself again to the victim of an assault when she first learned of it:
 Q. What was your reaction when you learned that Label Systems was suing you?
 A. Basically the same reaction I had every time. I felt like I was being assaulted, like I was being stabbed again.
Transcript (7/17/01), p. 7. In so doing, Ms. Markham underscored the deeply negative impact upon her both of the filing of this lawsuit and of the defendants' other "assaults" upon her, which expressly included their filing of the vexatious unemployment compensation appeal.
Finally, after Ms. Markham had fully described all the post-termination events which caused her to feel terrified, humiliated and beset by emotional distress, she was asked as follows to summarize the overall impact upon her of those events:
CT Page 9110 Q. Miss Markham, can you tell the jury how the termination from Label Systems and the proceedings you've been involved with since then have affected you?
 A. Well, this is sort of hard. I'm not used to talking to people. Burt around the time that I was terminated, I was nine months pregnant. I was expecting my first child, and it should have been the happiest time of my life. However, Ken Felis made it the worst time in my life. First, he terminated us, he had my husband arrested, and in my condition I had to go down, bail out my husband. I had to go to criminal court with him.
 No one came to see me at the hospital, none of the people that I thought were my friends from work. Nobody came. I was so distraught my brother from California came to stay with me. My sister came from New York, and my father came from Florida. I was terrified. I was humiliated. I suffered tremendous pain because of him. I felt like a hunted animal.
 That first night was the most terrible night in my entire life. We didn't know what was going to happen, if somebody was going to come to our house, if somebody was going to hurt us. We had blocked all the entrances. We lived at a condo in Oronoke Woods in Waterbury, and we blocked off all the entrances to the doors, to the screen doors, and every noise that we heard we were jumping.
 And I've lost all trust for people. Before 1993, I basically trusted everyone. I always thought there was good in everybody. I never thought there was such a thing as evil. You hear people do bad things, but you never expect those things to happen to you.
 Q How are you affected today by what happened to you in 1993 at Label Systems and the intervening events?
A I mourn for the person that I used to be. I mourn for my husband because he suffered such pain. I mourn for my children, especially my daughter because she's seen everything that I've gone through. She's seen the pain. She's seen the nights when I couldn't sleep, the crying, the anguish. She's seen her father suffer. It just CT Page 9111 doesn't go away. I'm always looking over my shoulder for another assault.
Transcript (7/17/01), p. 17. From this Court's observation, the foregoing testimony was especially powerful and persuasive.
In light of that testimony, the Court finds that there is a substantial evidentiary basis upon which the jury in this case could have found that "the proceedings [Ms. Markham has] been involved with since [her termination from Label Systems]" including the defendants' vexatious appeal from her award of unemployment compensation benefits — have been a substantial factor in bringing about the emotional pain, anxiety, humiliation and sense of loss which she has suffered so acutely since February 15, 1993. The commencement and prosecution of that appeal, which threatened her family's income and ability to survive in this country at an especially vulnerable time in their lives, was graphically described by her as a physical assault which made her feel like her throat had been ripped out. This testimony, if believed, surely afforded the jury a specific basis for concluding that the appeal added significantly both to her emotional distress in the four-month period when the appeal was pending and to the overall loss of trust which she has experienced in the wake of her termination.
The issue presented for the jury's decision on Ms. Markham's vexatious suit claim was whether the defendants' commencement and prosecution of he unemployment compensation appeal was a substantial factor in causing her post-termination pain and suffering, and if so, how deep and long lasting its negative effects upon her truly were. Considered in the light most favorable to sustaining the jury's verdict, the evidence well supports a finding that the effects of that appeal — an unjustified "assault" upon her honesty and integrity which directly threatened her financial well-being at a time of extreme emotional and financial stress for herself and her family — have been substantial. That those negative consequences may also have been proximately caused by other distressing events in her life does not in any way diminish the causal connection between those consequences and the appeal.
 II
Having decided that the evidence presented at trial was sufficient to prove that the defendants' vexatious prosecution of the subject unemployment compensation appeals proximately caused the plaintiffs to suffer mental and emotional harm, the Court must now decide if the damages awarded to them for that harm were so excessive as to shock the sense of justice, and thus to require the ordering of remittiturs as a matter of law. Noting that the total damages awarded to the plaintiffs CT Page 9112 was $440,000, the defendants argue that such awards, though conceivably appropriate to compensate the plaintiffs for all of their post-termination suffering had they prevailed on all of their claims at trial,[3] were entirely disproportionate to that portion of their proven suffering that was proximately caused by the prosecution of the subject appeals.
The appeals, they argue, were merely one in a series of disturbing events that allegedly caused the plaintiffs mental and emotional pain and distress following their terminations. Those other events, to reiterate, included: the terminations themselves, on grounds of felonious misconduct; the arrest of Mr. Agha on the day he was terminated for allegedly threatening Mr. Felis; the cutoff of the plaintiffs' health insurance benefits and interference with their right to purchase a COBRA to cover their newborn daughter's medical needs; the bringing of the instant action, and with it the pursuit of a prejudgment remedy; and the continuing prosecution of this action for a full eight years after the vexatious appeals were withdrawn.
The appeals, by contrast, were only pending for four months, during which all of the plaintiffs' claimed benefits were paid in full, without delay or interruption. Hence, though the prosecution of these appeals may have caused the plaintiffs to fear that their benefits might be terminated, or that all benefits they received might have to be repaid, any basis for that fear ended forever once the appeals were withdrawn. Against this background, claim the defendants, any distress caused by the appeals was but a small part of the plaintiffs' overall post-termination suffering. Accordingly, they argue that the jury's award of $440,000 is excessive as a matter of law, and must be substantially reduced.
The plaintiffs dispute the foregoing argument for several reasons, which this Court finds persuasive. Initially, they remind the Court that in Connecticut, "[t]he amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case the jury." Gaudiov. Griffin Health Services Corp., 249 Conn. 523, 551 (1999). Accordingly, a jury's assessment of damages should only be set aside when the verdict is plainly excessive and exorbitant. Wochek v. Foley, supra,193 Conn. at 586 (1984). Proper compensation for many forms of loss or injury cannot be computed mathematically, and thus the law furnishes no precise rule for its assessment. Russakoff v. Stamford, 134 Conn. 450, 455
(1948). Accordingly, when a verdict is challenged for excessiveness, the test applied "is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the award so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." Gaudio v.Griffin Health Services Corp., supra, 249 Conn. at 551. CT Page 9113
Under this test, it is certainly not necessary to present independent evidence of juror mistake or misconduct to set aside a verdict. The focus, instead, is on the size of the verdict in relation to the evidence claimed to support it.
In determining if the evidence is sufficient to support the jury's award, the Court must view the evidence in the light most favorable to sustaining that award. Herb v. Kerr, 190 Conn. 136, 140 (1983). Instead of indulging its own subjective notions as to what the verdict should have been, the Court must indulge every reasonable presumption in favor of sustaining the verdict as the jury returned it. Mather v. GriffinHospital, 207 Conn. 125, 139 (1988). In sum, "[i]f the jury could reasonably have reached its conclusion, the verdict must stand." Gaudiov. Griffin Health Services Corp., supra, 249 Conn. at 534.
Upon invoking the foregoing principles, which the defendants agree to be controlling, the plaintiffs first take issue with the defendants' attempt to apply them to the jury's aggregate award of $440,000. Initially, they note that the jury made two separate awards — one of $120,000 to Mr. Agha, the other of $320,000 to Ms. Markham. Hence, though the plaintiffs lived together as husband and wife throughout this difficult period, and were subjected by the defendants to similar tortious conduct, each suffered individually as a result of that conduct and was awarded separate damages for his or her individual suffering. Not surprisingly, because they are different people who had different vulnerabilities and experienced different reactions to what they went through, each was awarded damages in a different amount.
Furthermore, the plaintiffs rightly note that only half of their challenged damages awards constituted compensatory damages for their proven injuries and losses. The other half of each award, of course, is punitive or exemplary, for it results directly from the legislature's mandate that successful claimants under General Statutes § 52-568 (a) (1) recover "double damages." In determining if a jury's award of damages is excessive in relation to the nature and extent of the plaintiff's proven injuries and losses, logically the only component of that award that should be evaluated is that which purports to compensate him for those losses. See, e.g. Goral v. Kenney, 26 Conn. App. 231, 239 (1991) (wherein the Appellate Court, in reviewing the denial of a motion for remittitur, expressly focused its excessiveness analysis on the amount of the jury's verdict, not the larger amount of the trial court's judgment, because the latter included a "punitive" component of offer-of-judgment interest). Were it otherwise, the Court would not only be assessing the propriety of a decision the jury never actually made, but it would be undermining the legislature's mandate that successful claimants under General Statutes § 52-568 (a)(1) recover "double damages." CT Page 9114
Against this background, the plaintiffs rightly argue that the true questions presented for this Court's decision are whether their respective awards of compensatory damages — $60,000 for Mr. Agha and $160,000 for Ms. Markham — are so excessive as to shock the sense of justice, and thus to require the ordering of remittiturs as a matter of law. For the following reasons, the Court concludes that those awards are not excessive, and thus that the defendants' motion must be denied.
As for Mr. Agha, an award of $60,000 in compensatory damages is not excessive for many of the reasons already described in Part I of this Memorandum of Decision. Though only one of many distressing events in his life on and after the date he was terminated, the vexatious appeal was expressly identified by him as one of the significant factors that led him to lose all hope of surviving in America, and thus caused him to plead with his despondent wife to return with him to Iran. Though he never pulled up stakes and made the move, his sense of hopelessness and despondency, and betrayal by Mr. Felis, who confronted him in the unemployment compensation hearings, remained with him for a very long time. The depth of those feelings, as he expressed and visibly displayed them to the jury, was very great indeed — so great, in fact, that had the jury found for him on each count of the counterclaim and third-party claim, the jury's award of compensatory damages might reasonably have been greater than $60,000. Instead of evidencing partiality, prejudice, mistake or corruption, the jury's smaller award, though certainly not insubstantial, reflects a thoughtful exercise of judgment and discretion. The award would appear to represent a product of the jury's judgment both that the defendants' vexatious appeal had a substantial adverse impact upon Mr. Agha in the especially difficult period when it was pending, and a continuing impact upon him, along with many other causes, in the months and years that followed. As such conclusions were well supported by the evidence, the defendants' motion for remittitur as to Mr. Agha must be denied.
As for Ms. Markham, to whom the jury awarded $160,000 in compensatory damages, a similar analysis applies. As between her and her husband, there is no question that it was she whose post-termination suffering was deeper and greater, and more vividly described for the jury. Part of this was due, to be sure, to her vulnerable mental and physical condition throughout the early post-termination period, when the appeal was pending. A victim of depression even before these events unfolded, she had just lost her job based on claims of wilful and felonious misconduct, seen her husband arrested on a complaint of threatening, and given birth to her first child, for whom she had no health insurance benefits or means of support other than her unemployment benefits. With the filing of CT Page 9115 the appeals, that one lifeline was threatened, enhancing her feelings of powerlessness and humiliation as both she and her husband sank into despair. When she told the jurors that the filing of the appeal made her feel like her throat had been ripped out, she described a weighty impact which the jury might readily and reasonably have credited. Indeed, when the Court saw her give that testimony, it knew at once that the jury would be moved by it. If they disbelieved her or thought she was exaggerating, they could easily have rejected all her testimony as a gross overstatement of her claim. If they believed her, however, which was surely reasonable, they had a very strong basis in her testimony for concluding that the appeals distressed deeply, both when they were filed and prosecuted and long thereafter.
With Ms. Markham, even more than Mr. Agha, the evidence of her post-termination suffering was so substantial that a much larger award than $160,000 might well have been made had she prevailed on all of her claims. Rather than making such an award, however, which would have been inconsistent with this Court's instructions, the jury reasonably awarded her damages which, though ample, were certainly "within the necessarily uncertain limits of just damages" for that portion of her suffering which was proximately caused by the vexatious appeal.
 Conclusion
For all of the reasons stated in this Memorandum of Decision, the defendants' motion for remittitur is hereby
DENIED.
IT IS SO ORDERED this 12th day of July, 2002.
MICHAEL R. SHELDON, J.